Filed 7/16/25  In re Michael P. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MICHAEL P. et al., Persons Coming Under the Juvenile Court Law. | B338193 (Los Angeles County Super. Ct. No. 20CCJP04033A, C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KELLY P., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Kelly P. appeals from the juvenile court's orders denying her petitions under Welfare and Institutions Code section 388 and appointing a legal guardian for her sons Michael and William.[1]  Kelly received 15 months of family reunification services, but failed to make substantial progress in addressing the issues that led the court to assert jurisdiction over the boys.

More than three years after the Department intervened, and long after the court terminated reunification services, Kelly finally began a substance abuse treatment program.  After she completed that program, she filed section 388 petitions seeking custody of Michael and William or, in the alternative, additional family reunification services.  By that time, however, the boys had been in foster care for almost four years and had finally settled in the home of their great-aunt Maura C. with hopes of adoption.

We conclude the juvenile did not err in ruling Kelly's recent efforts, while commendable, came too late.  Therefore, we affirm.

_____

[1]     Statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Juvenile Court Declares Michael and William Dependent Children of the Court and Removes Them from Kelly*

In July 2020 the Los Angeles County Department of Children and Family Services received a referral claiming Kelly physically attacked the maternal grandmother Margarita P. (with whom Kelly and her six children[2] lived) while under the influence of a narcotic and in the presence of the children. The oldest child, Michael (11), left Margarita's apartment to get help from a neighbor and to call the police. William (9) intervened to protect Margarita and pulled Kelly to the ground. Kelly bit William on the shoulder, leaving a mark.

The court detained all six children from Kelly. Neither Michael's biological father, Mauricio C., nor William's biological father, Julio D., was involved with the family, and the Department initially could not locate either one. Joshua F. is the father of Kelly's other four children, but he did not live with the family. The Department placed Michael and William with maternal great-aunt Connie M.

In December 2020 the juvenile court sustained a petition under section 300, subdivisions (a), (b), and (j). The court found true allegations that Michael and William had suffered, or there was a substantial risk they would suffer, serious physical harm inflicted nonaccidentally or accidentally because (1) Kelly had a

---

[2]    Only Michael and William are at issue in this appeal. When the Department intervened, Kelly's children ranged in age from 11 years old to three months old.

history of engaging in violent altercations, including one with Margarita where Kelly bit William when he tried to protect Margarita; (2) Kelly's companion Joshua physically abused Michael by hitting the child with his fists, and Kelly failed to protect Michael from Joshua; (3) Kelly physically abused the children by striking them with a cell phone charger cable and a belt; (4) Kelly had a history of substance abuse, was a current abuser of marijuana and amphetamine, and used illegal drugs in the presence of the children, all of which rendered her unable to provide the children with regular care and supervision; and (5) Joshua had a history of illegal drug use, including amphetamine and methamphetamine, and was a current abuser of marijuana. The court also found true allegations that Kelly and Joshua had previously abused one or more of the siblings and that there was a substantial risk Michael and William would be abused or neglected, within the meaning of section 300, subdivision (a) or (b).

The juvenile court declared Michael and William dependent children of the court, removed them from Kelly, and ordered family reunification services for Kelly. Kelly's case plan included a drug and alcohol rehabilitation program, weekly drug testing, a 12-step program, and individual counseling and courses to address case issues, including anger management, age-appropriate discipline, substance abuse, and the effect of family violence and drug abuse on children. The court ordered monitored visitation for Kelly and gave the Department discretion to liberalize visitation. The court bypassed reunification services for Mauricio and Julio, the biological fathers of Michael and William, respectively, under section 361.5, subdivision (b).

B.     *Kelly Does Not Substantially Comply with Her Case Plan, and the Juvenile Court Continues Family Reunification Services*

In June 2021 the court held the six-month review hearing under section 366.21, subdivision (e).  Prior to the hearing the Department reported Michael and William had moved to a second placement with a non-family member, and later to a third placement.  Kelly made some effort to comply with her court-ordered case plan.  The Department reported Kelly was participating in an anger management class, a parenting class, a domestic violence class, and individual counseling.  Regarding weekly drug testing, Kelly tested negative on three occasions, but was a "no show" for the other 16 tests during the period of supervision.  Regarding visitation with Michael and William, the Department said Kelly was "inconsistent with calling her children" and only "sporadically" called the children and logged in for virtual visits.  Kelly visited the children in person once[3] and did not consistently maintain contact with the Department.  In a last minute information report, the Department stated Kelly enrolled in substance abuse counseling in April 2021 but attended only one session.

The court found that Kelly had not substantially complied with her case plan and that returning Michael and William to Kelly would create a substantial risk of detriment to their safety and well-being.  The court ordered the Department to provide additional family reunification services, but warned Kelly that

---

[3]     Because of the COVID-19 pandemic, the Department facilitated mostly virtual visits during this time.

the court would seriously consider terminating those services at the next hearing if she continued to miss drug tests and visits.

      C.    *Kelly (Still) Does Not Substantially Comply with Her Case Plan, and the Court Terminates Family Reunification Services*

After the six-month review hearing Michael and William moved to a new (their fourth) placement, this time with Mr. and Mrs. U. For the next review hearing the Department reported Kelly had complied with some aspects of her case plan. Although Kelly was attending an anger management class and had completed a parenting class, she was still not participating in a substance abuse program. Kelly attended only two substance abuse program sessions in May 2021 and said "she did not understand why she needed to do a substance abuse program." Kelly appeared only twice for random drug testing during the period of supervision (testing negative both times). She claimed she lost her identification card and could not test on the other occasions. And Kelly was not participating in a 12-step program, as required by her case plan. Regarding visitation, the Department reported that Kelly had only one in-person visit with Michael and William during this period and that she called the boys inconsistently. The Department recommended terminating Kelly's reunification services and continuing monitored visitation.

The Department also submitted concurrent planning assessments. The Department identified Mr. and Mrs. U. as possible long-term foster parents or legal guardians for the boys.

At the 12-month review hearing in November 2021 the juvenile court found returning Michael and William to Kelly

6

would create a substantial risk of detriment. The court also found Kelly had not substantially complied with her case plan because she had not participated in a substance abuse program, appeared consistently for drug testing, or visited the children regularly. The court terminated her family reunification services. The court set the matter for a permanency planning hearing under section 366.26 on February 28, 2022 and transferred educational rights for Michael and William to Mr. and Mrs. U.

D.     *Permanency Planning Is Delayed*

Permanency planning for Michael and William lasted more than two years. The boys initially adapted well to their placement with Mr. and Mrs. U., who agreed in early 2022 to serve as legal guardians for both boys, and in May 2022 the court identified legal guardianship as the permanent plan for Michael and William. In June 2022, however, Michael asked the Department to move him from the home of Mr. and Mrs. U., saying the couple was too strict. Mr. and Mrs. U. later withdrew their consent to guardianship, after both Michael and William became discontented with the placement. The Department placed Michael with another foster parent at the end of June 2022. After Michael left the home, William became increasingly frustrated with Mr. and Mrs. U. and began regularly yelling at and disrespecting them. William later admitted Kelly asked him to sabotage his placement with Mr. and Mrs. U. so that William could request placement with his half siblings' foster family and then sabotage their plans for permanency. Because of these issues, the Department requested, and the court granted, additional time for permanency planning.

7

Regarding visitation, the Department reported in late 2021 Kelly visited the boys inconsistently, sometimes failing to show up for visits after confirming the day before. During the first half of 2022 Kelly and Margarita visited the children regularly (every other weekend), but Kelly tended to spend time with her daughters rather than with Michael and William. During the second half of 2022 Kelly did not visit the children for several months. When she did visit, she tended to focus her attention on Michael, saying that he "is her baby and that he is the most special of all siblings."

The Department updated the court in late October 2022 and identified adoption as the most appropriate plan for Michael and William. Because neither of the boys' foster parents committed to adoption or legal guardianship, the Department hoped to recruit an adoptive family for both boys. On November 4, 2022 the court identified adoption as the permanent plan for Michael and William.

The Department updated the juvenile court again in January 2023. The Department had placed Michael and William with Maura (the maternal great-aunt) in December 2022. Maura told the Department she wanted to adopt both boys. The court granted the Department's request for additional time to assess the situation. Meanwhile, Kelly continued to have monitored visitation with the boys every other weekend. At one point, however, the case social worker suspended Kelly's visits because Kelly was "unable to abide by the rules in the visitation agreement and failed to take the several warnings to correct her behaviors during visits with children."

In May 2023 the Department reported that Maura still wanted to adopt Michael and William and that the Department

had approved Maura for adoption.  The boys had settled into their new home and wanted Maura to adopt them.  Regarding visitation, Kelly visited the boys only three times between the middle of December 2022 and the end of May 2023 and did not call them at all.  Michael and William told the case social worker that they no longer wanted to visit with Kelly.  The Department recommended the court terminate Kelly's parental rights so the Department could move forward with the adoption process.

In an August 2023 report the Department said Michael and William continued to be comfortable in Maura's home and wanted Maura to adopt them.  The Department said Kelly contacted the case social worker on August 7, 2023 to report she had been participating in an outpatient drug rehabilitation program for the past two months.  Kelly also said she wanted to "reverse" the orders terminating her parental rights for all her children and wanted Maura to become a legal guardian (rather than an adoptive parent) for Michael and William.  Kelly visited Michael and William once in July 2023 and once in August 2023.  Kelly gave birth to another child (her seventh) on August 16, 2023.

In December 2023 the Department reported Michael and William continued to live comfortably with Maura.  Between mid-August 2023 and mid-December 2023 Kelly visited the boys only once.  The Department recommended the court terminate Kelly's parental rights and order the Department to facilitate the boys' adoption.  The court scheduled a hearing on whether to terminate parental rights and select a permanent plan for January 2, 2024.

E. *Kelly Files Petitions Under Section 388 Seeking Custody of Michael and William or Reinstatement of Family Reunification Services*

On December 29, 2023 Kelly, claiming a change of circumstance, filed petitions under section 388 asking the juvenile court to return Michael and William to her custody or, in the alternative, to reinstate family reunification services. Kelly stated that during the pendency of the case, she completed 23 parenting classes, 20 domestic violence classes, 22 anger management classes, 23 individual counseling sessions, and online parenting classes. In addition, Kelly said, she completed an eight-month outpatient drug rehabilitation program on December 8, 2023. As part of that program, she participated in 96 group therapy and 11 individual therapy sessions. Kelly said she was participating in an aftercare program and was living a healthy, drug-free life. Kelly also said that she visited the boys every weekend or every other weekend for two to six hours per visit and that she spoke to the boys using a video conferencing software application at least three times a week. Kelly said she was working part time and was taking a job training course to learn medical billing. Kelly and her infant son were living with Margarita. The court set a hearing on the section 388 petitions for February 8, 2024 and continued the section 366.26 hearing to that date.

In its response to Kelly's section 388 petitions the Department reported on its most recent interview with Kelly in December 2023. During the interview the Department investigator discussed with Kelly the Department's prior involvement with the family: In 2015 the Department (among other things) had removed Kelly's children after one of them

10

tested positive for amphetamine at birth. Although Kelly participated in a substance abuse program during the prior dependency case, she ultimately relapsed. During the December 2023 interview Kelly minimized the problems arising from her long-standing substance abuse. Because Kelly displayed a lack of insight about her earlier relapse, the Department questioned how much benefit she received from the program she completed in 2023. And though Kelly denied using drugs with Joshua, the Department observed Kelly's prior period of sobriety (2015-2017) was while he was incarcerated. The Department reported that Kelly said she had been sober since June 2022, but that she did not seek prenatal care until May 2023, which was the same month she started the drug rehabilitation program, only three months before she gave birth to her youngest child. The Department also reported that Kelly's aftercare program would last only two to three months and that Kelly did not have a 12-step sponsor.

F.    *The Court Denies the Section 388 Petitions and Continues the Hearing Under Section 366.26*

The court denied the section 388 petitions on February 8, 2024. The court found Kelly did not meet her burden to demonstrate either that there was a changed circumstance or that reinstating reunification services or making a change in placement was in the best interests of Michael and William. On the issue of whether Kelly had shown a changed circumstance, the court acknowledged that Kelly made "quite a lot of progress" during the case and that Kelly recently completed a drug rehabilitation program. But the court also said that Kelly lacked insight into her drug use and that she minimized prior incidents

11

of violence in the home involving Michael. The court also stated Kelly appeared to minimize issues (such as drug use and domestic violence) regarding Joshua. In addition, the court said, the most substantial changes Kelly made occurred after her seventh child was born—just a few months before the hearing. Regarding the best interests of Michael and William, the court found that the boys were differently situated from Kelly's new baby and that the boys deserved permanency, given that the case had been pending for such a long time (approaching four years.)

Regarding permanency planning, counsel for Michael and William told the juvenile court that, contrary to the Department's prior reports, the boys no longer wanted to be adopted. The court continued the hearing under section 366.26 and ordered the Department to meet with Michael, William, and Maura to discuss permanency options.

G. *The Court Selects Legal Guardianship as the Permanent Plan*

The court held the permanency planning hearing on May 23, 2024. The court found that Maura was willing to adopt Michael and William, but that the boys did not want the court to terminate Kelly's parental rights to facilitate adoption. The court selected legal guardianship with Maura as the permanent plan and issued letters of guardianship.

On May 28, 2024 Kelly filed a notice of appeal challenging the February 8, 2024 orders denying her section 388 petitions and the May 23, 2024 orders selecting legal guardianship as the permanent plan. We granted Kelly's request for relief from her untimely appeal from the February 8, 2024 orders.

## DISCUSSION

A. *Applicable Law and Standard of Review*

Section 388, subdivision (a)(1), provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." To prevail on a section 388 petition, the petitioner must show ""by a preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child."" (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122, italics omitted; see *In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.)

Because Kelly had the burden to demonstrate there was new evidence or a change of circumstance, we review the juvenile court's finding Kelly failed to meet her burden by determining whether the evidence compels a finding in her favor on that issue as a matter of law. (See *In re Matthew M.*, *supra*, 88 Cal.App.5th at p. 1194 ["If the juvenile court has ruled the moving party failed to carry his or her initial burden to demonstrate new evidence or change of circumstance, the first step of the analysis, the question for the reviewing court is whether that finding is erroneous as a matter of law."].) Specifically, we determine whether "the evidence 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to

13

support a finding.""" (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4.)

"We review the court's best interest determination, the second step, for abuse of discretion and may disturb the exercise of that discretion only in the rare case when the court has made an arbitrary or irrational determination. [Citation.] We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court. [Citation.] We ask only whether the juvenile court abused its discretion with respect to the order it made." (*In re Matthew M.*, *supra*, 88 Cal.App.5th at pp. 1194-1195; see *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Malick T.*, *supra*, 73 Cal.App.5th at p. 1123.)

B.      *The Juvenile Court Did Not Err in Ruling Kelly Failed To Demonstrate a Substantial Change in Circumstance*

"'Not every change in circumstance can justify modification of a prior order'" under section 388. (*In re N.F.* (2021) 68 Cal.App.5th 112, 120; see *In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "'"[T]he change in circumstances must be substantial."'" (*In re Malick T.*, *supra*, 73 Cal.App.5th at p. 1122; see *In re J.M.* (2020) 50 Cal.App.5th 833, 845.) And where, as here, the juvenile court has terminated a parent's reunification services, a substantial change means "the problem that initially brought the child within the dependency system [has been] removed or ameliorated." (*In re A.A.*, at p. 612; see *In re J.M.*, at p. 846 ["parent establishes a substantial change of circumstances

14

for purposes of section 388 by showing that . . . he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction"].)  Here, the bases of the juvenile court's jurisdiction were Kelly's history of physical altercations in the presence of the children, history of substance abuse, physical abuse of the children, and failure to protect the children from physical abuse by Joshua.

In her section 388 petitions Kelly argued there was a substantial change in circumstance because she (finally) was complying with her case plan.  Kelly submitted certificates showing that she completed parenting, domestic violence, and anger management classes and that she participated in individual counseling sessions.  But because all of that evidence related to Kelly's progress during the early stages of the case (2020-2021), it did not support her petitions under section 388.  "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, *during the period between termination of reunification services and the permanency planning hearing*, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction."  (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846, italics added.)  "'[T]he term "new evidence" in section 388 means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered.'"  (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1093; see *In re Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195 [mother's explanation of her opposition to vaccines, initially expressed at the six-month hearing, was not "new" evidence that would support section 388 petition].)

Kelly also argued there was a significant change of circumstance because she had recently completed an outpatient drug rehabilitation program and was participating in an aftercare program. The court acknowledged Kelly's significant progress in addressing her substance abuse, but found that progress, without more, did not show a significant change of circumstance. Kelly complains the juvenile court did not give her evidence sufficient weight. As discussed, however, we do not consider whether the evidence could have supported a different finding. The question is whether the evidence compels a finding in Kelly's favor as a matter of law. And it does not. "The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.)

There was also evidence Kelly had previously attempted but failed to maintain sobriety. In 2015 the Department removed Kelly's children after one of them tested positive for amphetamine at birth, and Kelly was participating in a substance abuse program at that time. Where, as here, a substance abuse problem is persistent despite attempts at treatment, the court is not compelled to find a material change in circumstance after a brief period of sobriety. (See, e.g., *In re N.F.*, *supra*, 68 Cal.App.5th at p. 121 [no changed circumstance where the mother recently completed a residential drug treatment program but had previously completed similar programs and relapsed]; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [parents' most recent efforts at sobriety "were only three months old" and did not demonstrate a changed circumstance]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [parent's seven months of sobriety since his last relapse were insufficient to show a

changed circumstance, given the parent's history of drug use, periods of sobriety, and relapses]; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].)

Kelly argues the juvenile court applied the wrong legal standard by requiring her to demonstrate a "fully changed" circumstance rather than a "changing" circumstance. The juvenile court, however, articulated the correct standard. The court stated: "The [section] 388 standard is well known to all of you, which is, number one, there has to be a changed circumstance, and number two, there has to be—if there is a changed circumstance, I have to find it's in the children's best interest to change a prior court order." And the court properly applied that standard at the hearing. True, the court observed the situation was also "changing" in that Kelly was continuing to make progress: "Even if [Kelly] had met her burden on the first prong of showing a fully changed rather than what I believe I see here which are changing circumstances that remain in progress and remain changing, especially as I said it does appear in part that the birth of the child, the youngest child, may also be further motivating mother, which is great, but I don't believe that that shows a fully changed circumstance here."[4] But as discussed,

---

[4]    This part of the court's articulation of the standard, though it finds support in the case law (see, e.g., *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [mother's "recent sobriety reflects 'changing,' not changed, circumstances"]), was not entirely correct. As discussed, the issue is whether the change is material or substantial, not whether the change is independent of, or part of the process of, changing. Indeed, a circumstance that is changing has, by definition, changed, though it may not have

17

recovery from drug addiction is an ongoing process, not something that happens overnight.

Citing *In re S.S.* (2020) 55 Cal.App.5th 355, Kelly argues "the juvenile court was 'too cavalier given the important role section 388 petitions play in the constitutionality of California's dependency scheme.'" The father in *S.S.* did not have stable housing or employment at the outset of the dependency proceedings, but asked the juvenile court to change the custody order after he stabilized his situation. The court in *S.S.* did not decide whether the juvenile court erred in denying the father's section 388 petition, but commented generally that a parent's recent change of circumstance should not be dismissed: "Although the developments were recent, [the father] testified he had finally obtained a permanent full-time job at higher pay as well as health care and childcare assistance that would benefit [the child]. He also testified he had nearly completed individual counseling and parent education. While these developments were new, the court's determination that father had established only that his circumstances were 'changing, not changed,' was too cavalier given the important role section 388 petitions play in the constitutionality of California's dependency scheme." (*S.S.*, at pp. 379-380.)

The juvenile court did not dismiss Kelly's progress, nor was the court "cavalier" in its approach. To the contrary, the court diligently reviewed not only Kelly's petition and the Department's response, but also the entire case file for Michael

---

changed enough to be a substantial or material change. Except perhaps at infinitesimal intervals, where $t_2 - t_1$ approaches 0, changing is a change.

and William, as well as the files for their siblings. The court carefully considered all the evidence relating to the nearly four years of dependency proceedings and concluded, in the context of the entire history of the case, Kelly had not yet achieved a sufficient level of stability and sobriety to constitute a significant change of circumstance. (See *In re N.F.*, *supra*, 68 Cal.App.5th at p. 120 ["In determining whether the petitioning party has carried his or her burden [on a section 388 petition], 'the court may consider the entire factual and procedural history of the case.'"].) Given that Kelly filed her section 388 petitions only a few weeks after she completed a substance abuse treatment program, the evidence did not compel a different conclusion.

C. *The Juvenile Court Did Not Abuse Its Discretion in Ruling the Proposed Modifications Were Not in Michael's or William's Best Interests*

Even if Kelly had shown a substantial or material change in circumstance, the juvenile court did not abuse its discretion in ruling it was not in Michael's or William's best interests to return either of them to Kelly or to reinstate family reunification services. "[B]est interests is a complex idea" that requires the court to consider a variety of factors. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 530.) Where, as here, "a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests. [Citation.] The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability." (*In re Malick T.*, *supra*, 73 Cal.App.5th at pp. 1122-

19

1123; see *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re J.M.*, *supra*, 50 Cal.App.5th at p. 847.)

In her section 388 petition Kelly alleged changing custody or resuming reunification services was in the boys' best interest because she visited Michael and William frequently, supported and encouraged them, and remained bonded with them throughout the dependency proceedings. There was, however, plenty of contrary evidence. As discussed, during the extended proceedings in this case Kelly called and visited the boys sporadically, occasionally failing to call for months at a time. And at most, Kelly visited with the boys and their siblings for a few hours every other weekend. Though Kelly may have sometimes offered support and encouragement, there was also evidence she engaged in less healthy interactions. For example, Kelly consistently favored one or two of the children when she visited with all them. She also encouraged William to disrupt his placement with Mr. and Mrs. U. so he could join his siblings, with the end goal of disrupting the siblings' permanency plans. These types of interactions injected chaos and instability into the boys' lives. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527 ["after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability"]; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251-252 ["children should not be made to wait indefinitely for mother to become an adequate parent"].) In contrast, Maura provided Michael and William with a stable and loving home and was willing to adopt them. Both boys felt comfortable in her care and, until Kelly attempted to reunify with them in 2024, the boys wanted Maura to adopt them. (See *In re*

20

*N.F.*, *supra*, 68 Cal.App.5th at p. 122 [juvenile court did not abuse its discretion in denying a section 388 petition where the child "was thriving in [the caregiver's] stable home and was bonded to them," the caregivers "loved [the child] and were committed to providing her permanency through adoption," and the mother's "circumstances were unstable"].)[5]

## DISPOSITION

The orders are affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.

---

[5] As stated, Kelly also appealed from the court's legal guardianship orders. Kelly argues only that the juvenile court erred in making those orders because it did so after erroneously denying her petitions under section 388. Because the court did not err in denying the petitions under section 388, Kelly's challenge to the guardianship orders fails.